35 P.(2d) 291

MAYFIELD v. CROWDUS.

No. 3954.

Supreme Court of New Mexico.

Aug. 18, 1934.

Jones, Goldstein, Hardie & Grambling, of El Paso, Tex., and W. C. Whatley, of Las Cruces, for appellant.

Edwin Mechem and J. B. Newell, both of Las Cruces, for appellee.

SADLER, Justice.

The appellee, as plaintiff below, recovered damages against appellant (defendant at the trial) for the death of appellee's wife from injuries suffered in an automobile collision occurring at the intersection of Picacho avenue and Alameda boulevard in the town of Las Cruces. The trial was before the district court of Otero county on change of venue. The judgment was entered on the verdict of a jury charged in a manner agreeable to both parties, as evidenced by the absence of exceptions to the trial court's affirmative instructions. Complaint is made, however, of the trial court's refusal to direct a verdict in defendant's favor and of its refusal of one specially requested instruction. It will avoid confusion to refer to the parties as they aligned themselves below.

The plaintiff, prior to suit, qualified as administrator of the estate of his deceased wife, Clarice E. Mayfield, and sued in that capacity.

The collision occurred between 7:30 and 8 o'clock on the night of January 8, 1933, at the intersection of the two streets mentioned. Picacho avenue and Alameda boulevard are

paved streets intersecting in a residential section of the town and within the corporate limits thereof. Both streets carry a considerable volume of traffic. The former extends east and west and the latter north and south. Upon the occasion in question, the plaintiff, driving, and accompanied by his wife, was proceeding in a westerly direction on Picacho avenue and the defendant alone in her car was driving in a southerly direction on Alameda boulevard. At a point just west of the center of the intersection the defendant's car struck the right rear wheel and fender of plaintiff's car. The plaintiff was driving a light type of car, a Chevrolet coupé, while defendant's car was of a much heavier make, a Cadillac sedan. The force of the collision was such that it turned plaintiff's car completely around in the street and it came to rest on the south side of Picacho avenue, facing east, the direction from which it had been traveling, and west of the intersection. The defendant's car was swung suddenly to the right and crashed into the curb and a retaining wall at the southwest corner of the intersection.

The violence of the impact hurled both plaintiff and his wife from their car. The former, although temporarily stunned, suffered no serious injuries. His wife, a young woman twenty-nine years of age, incurred head injuries from which she died en route to the hospital from the scene of the collision.

The damage to the automobiles involved was not great and no claim on account thereof is here presented. The left front fender and bumper on defendant's sedan were bent and the glass and reflector in the right headlamp were broken out. In addition, the heavy steel frame of the car was bent to the first cross-member, three inches to the right and out of line. The right rear fender and wheel of plaintiff's car were badly smashed and the glass in the right door was broken. The physical condition of the cars following the collision leaves no doubt that defendant's car was propelled into plaintiff's on the rear right side thereof.

Whether or not validly designated such by ordinance, Picacho avenue, for some time prior to date in question, was known as a through street and marked as such. By Ordinance 157 effective September 13, 1929, Alameda boulevard along with other thoroughfares was designated a through street and all traffic required to come to a full stop before entering same. But by Ordinance 165, amendatory to the former ordinance, enacted December 1, 1931, following the completion of Federal Aid Project 176–A through Las Cruces, so much of Picacho within the town limits as formed a part of said project was designated a through street, subject to the same regulations for entering such streets enjoined by Ordinance 157. It is the validity of Ordinance 165 which was questioned below and the trial court held it had only a de facto existence.

Albeit, following the purported enactment of Ordinance 165 and in early June, 1932, stop signs were erected by one J. J. Turner, town manager, in the center of Alameda boulevard, on the north and south sides of the

intersection in question. He also erected two standard highway signs with the word "stop" thereon; one on the west curb of Alameda boulevard, 109 feet north of the intersection, and the other on the east curb thereof, approximately 50 feet south of said intersection.

In addition to the stop signs so erected in the street at the intersection, the one on the north side thereof being about 6 inches high and 18 inches wide, with the word "stop" painted on it, and with a red reflector about 2½ inches in diameter imbedded in the sign, there was painted on the paving in the street, at the north and south sides of the intersection, the word "stop" in white letters about 3 feet in height, with an arrow 20 feet in length pointing to the same.

On Picacho avenue at the intersection two rubber flap signs were placed in the center of the street, on the east and west sides of the intersection, the one on the east side having the word "slow" thereon, and the one on the west side the words "slow school." In addition to these signs, there was a state highway sign, with the word "slow" thereon, approximately 109 feet east of the intersection on the north side of Picacho avenue.

There was also located on the northwest corner of the intersection a street light. The light was on a bracket, approximately 18 feet above the paving. The bracket protrudes into the intersection about 5 feet from the post supporting it. The city employs 100 candle power lights for its street lighting. This street light was burning the night of the collision. It aids illumination both of the white painted sign on the paving and the middle button of the stop sign.

That portion of Picacho lying east of Alameda and west of Main street was embraced in Federal Aid Project 176–A and was opened up as a new street contemporaneously with the completion of the paving of said project through Las Cruces in the latter part of 1931 or early 1932. Prior thereto Picacho intersected Alameda from the west but did not extend beyond. The stop sign theretofore located at the intersection of Picacho and Alameda on the west to indicate Alameda as a through street, following the paving of Picacho from Alameda to Main as a part of said Federal Aid Project and the passage of Ordinance 165, was removed from the westerly intersection of Picacho and Alameda. And as above stated, stop signs were thereafter placed in Alameda north and south of its intersection with Picacho to designate the latter henceforth as a through street.

One R. P. Porter owns the property on Picacho avenue at the northeast corner of the intersection, and a residence approximately 85 feet north of the intersection, on the east curb of Alameda boulevard, is situated thereon. Accordingly, drivers of cars, except as hindered by moving traffic, approaching the intersection from the east, have practically an unobstructed view of Alameda boulevard, to their right, to a point approximately 186 feet north of the intersection; the view being obscured only in one place by two small trees. Likewise, drivers of cars south bound on Alameda boulevard, from a point 186 feet north of the intersection, have an unobstructed view of the entire length of

Picacho avenue east of the intersection to Main street, except for the two small trees mentioned.

The jury would have been warranted in accepting a version of the collision and its background substantially as follows: The plaintiff entered the intersection traveling west on Picacho at a speed between 18 and 20 miles per hour. It was a dark night and both cars involved had their lights burning. While yet some distance back on Picacho, perhaps 25 yards from the intersection, plaintiff observed a car enter the intersection on Alameda from the south, traveling north. It had safely cleared the intersection before he entered it. Also before reaching the intersection, but as he neared it, he saw the lights of a car coming south on Alameda. This car, of course, was the one driven by defendant. When he first observed this car, plaintiff was some 20 to 25 steps (60 to 75 feet) from the center of the intersection of Picacho and Alameda. He could not say exactly how far north on Alameda this car was when first observed except to remark that it was "back up Alameda a short ways" and north of the stop sign. The plaintiff testified:

"Q. After you entered the intersection now, just state what happened. A. Well, driving up to it before I run on to it, I looked both ways, and I noticed a car coming from the North, and I didn't notice it anymore until it was right on me at the stop sign, and that was when the collision happened.

"Q. How far had you gone on the intersection when you noticed that car right there

at you? A. I was across the center of the intersection.

"Q. Across the center of the intersection? A. Yes, sir.

"Q. And what—did that car, which was approaching you from the North,—did it stop there at that intersection? A. No, sir."

The plaintiff had been traveling Picacho for practically a year before the date in question, knew of the presence of the stop signs on Alameda, and had observed that traffic stopped on Alameda in obedience to the stop signs before entering Picacho. The defendant also knew of said stop signs and testified she did stop her car before entering Picacho on the occasion in question; that she drove up to the stop sign, brought her car to a stop, looked to the right, then to the left, and seeing no car entered the intersection. She further testified:

"Q. State how the accident occurred? A. I remember nothing until the crash of the cars.

"Q. When did you first see Mayfield's car? A. When we hit when the collision occurred.

"Q. It was at the time of the collision you first saw the car? A. Yes."

The defendant does not question, nor successfully can, sufficiency of the evidence to sustain a finding by the jury that, ignoring or disregarding the stop sign on Alameda, she drove directly through it at an unsafe and dangerous speed and into and upon the car driven by plaintiff after the latter had cleared the center of the intersection travel-

ling west on Picacho. If so, and a finding to such effect is within the verdict, a charge of negligence laid in the complaint is established. It supports the judgment rendered, unless, as claimed, the plaintiff himself was guilty of such contributory negligence, imputable to his deceased wife, as to bar recovery. The defendant charged contributory negligence to plaintiff in entering the intersection at an excessive rate of speed and with failing to keep a proper lookout so as to observe the approach of defendant's car from the north and to his right.

It seems to have been taken for granted by the parties, and acquiesced in by the trial court, as reflected by the pleadings, instructions, and absence of any note of dissent from such view, that any negligence of plaintiff, the driver of his car, was to be imputed to his wife, who accompanied him as a passenger. Without asserting the contrary, it is at least worthy of mention that the United States Supreme Court, in a late case, Miller v. Union Pacific Railroad Company, 290 U. S. 227, 54 S. Ct. 172, 78 L. Ed. 285, holds differently.

■■ For the reason indicated and for the purposes of this case it must be considered that any negligence of plaintiff contributing directly and proximately to cause the injuries complained of will suffice to defeat recovery. It must also be recognized that the issue of contributory negligence by the verdict of the jury is resolved against the defendant. This leaves open the question whether the undisputed facts entitled defendant to have declared as a matter of law that contributory negligence on plaintiff's part barred recovery.

A careful review of the record satisfies us that it would have been error for the trial court so to have instructed. Counsel for defendant place main reliance upon the plaintiff's admission that while yet some 20 to 25 steps (60 to 75 feet) from the center of the intersection, he observed the lights of defendant's car approaching from the north on Alameda, and that he did not again see the car until it overran the stop sign and crashed into him when he was slightly beyond the center of the intersection. It is admitted that except as hindered by passing traffic and but for the presence of two small trees, the plaintiff had an unobstructed view of Alameda to his right from the point where he first observed defendant's car down to the intersection.

But defendant had a like view of Picacho to her left, the two trees remained, and there was passing traffic. Somewhere in its course north on Alameda the car which cleared the intersection before plaintiff entered it, and which passed defendant's car coming south before the latter reached the intersection, necessarily crossed the line of vision of the drivers of the two cars involved.

And there was this distinction between the situation of the two drivers. The plaintiff was proceeding upon a street, Picacho, which was known, marked and generally observed as a through street. Even though noting defendant approaching Picacho from the north, he might initially assume without the assumption involving an imputation of negli-

gence, at least until he observed or should have observed the contrary, that defendant would bring her car to a stop, before entering the intersection. The defendant could indulge no such assumption. Such an assumption by her would itself suggest negligence. She was entering a thoroughfare well marked and lighted to designate its status as a through street. If its status as such were not already known to her, as she admits it was, the notoriety and prominence of the markers could not have failed to advise.

Whether the plaintiff exercised such care as a person of ordinary prudence would under the same or similar circumstances in view of the surroundings was, we think, clearly a question for the jury. At least during a portion of the time covered by his near approach to the intersection due care required his observation of the car crossing his route ahead of him. He must watch both cars, one of which he justifiably may have felt would come to a stop before intercepting his course. It was for the jury to say whether he did use proper care under all the circumstances. Having so said, we do not feel warranted in disturbing its finding.

Then, how is the jury's finding affected by the circumstance that evidence was adduced relative to the enactment of Ordinance 165 which the trial court upon defendant's motion refused to strike? We think not at all. We cannot assume that the jury gave this evidence more weight than it imports or that it credited the ordinance with doing more than it presumes to do. It only purports, so far as material, to amend the former ordinance to the extent of making Picacho a through street from the east line of its intersection with Alameda through to Main. The defendant had the benefit of this fact in argument to the jury. It could not have been mislead by the amendatory ordinance which on its face disclosed it did not affect Picacho west of its eastern intersection with Alameda.

The important thing was that following the enactment of this ordinance, the city through its town manager designated Picacho a through street across Alameda both by markers and signs and that, for at least six months prior to the death of plaintiff's wife, it was generally known and observed as such.

The remarks of the Supreme Court of Washington in the late case of Comfort v. Penner, 166 Wash. 177, 6 P.(2d) 604, 606, are so pertinent to the contentions of appellant that we quote from that opinion, as follows:

"We do not consider it necessary to determine whether or not section 61 of the traffic ordinance is contrary to the motor vehicle code or the constitutional inhibition above quoted. The stop sign had been maintained and renewed at that intersection since May, 1928. Presumably, it was erected and maintained by legally constituted authority; *but whether so or not is of no particular moment, as it was at least a de facto warning sign.* Whether it was a de jure warning sign or not is not necessary to determine. It was maintained for the safety of traffic. Travelers upon public highways are not expected to first ascertain and determine whether such signs are established in strict compliance

with law before respecting them. (Italics ours.)

"In Lawe v. Seattle, 163 Wash. 362, 1 P. (2d) 237, traffic on a certain street had been regulated to go one way, merely by directions spread out on the pavement in large letters 'One Way Traffic,' with an arrow pointing contrary to the direction in which one of the drivers was proceeding. It was there held that the plaintiff was not guilty of negligence in assuming that the driver proceeding in the direction against the traffic sign would comply with the traffic signal."

■ Even though no statute requires observance of stop signal at intersection, failure to obey same may be found to constitute common-law negligence. 5 Blashfield's Cyclopedia of Automobile Law (1932) 68; Roberts v. Wilson, 225 Mo. App. 932, 33 S.W.(2d) 1C9.

,■ It also seems well settled that an automobile driver, with knowledge of location of stop signs, has a right to rely, when crossing intersection, upon the assumption that any one approaching will observe same, at least until under all the circumstances and his observation he is apprized to the contrary. 3–4 Huddey's Cyclopedia of Automobile Law (9th Ed.) § 154; 1 Blashfield's Cyclopedia of Automobile Law, § 24; 5 Id. (1932) p. 68; Lord v. Austin (Mo. App.) 39 S.W.(2d) 575, 577; Shuck v. Keefe, 205 Iowa, 365, 218 N. W. 31.

The facts in Lord v. Austin, supra, and Layton v. Cregan & Mallory Co., 265 Mich. 574, 252 N. W. 337, are not unlike those present in the case at bar. In the Lord Case, the defendant had run through a stop sign and collided with the plaintiff in the intersection. While not questioning the sufficiency of the evidence to sustain the finding of negligence against himself, he urged vigorously that plaintiff's contributory negligence barred recovery as a matter of law. Such is the defendant's position here. The court said: "Though there is no issue raised in regard to the sufficiency of the proof of their own negligence, defendants nevertheless argue that the demurrer to all the evidence should have been sustained, upon the ground that plaintiff was shown by her own evidence to have been guilty of contributory negligence as a matter of law. While we have no doubt that the facts and circumstances in the case were such as amply to have warranted the submission of the question of plaintiff's own negligence to the jury, we cannot believe that that dire result may be said to have appeared conclusively from her own evidence. In determining this question, the evidence, and the inferences deducible therefrom, must be viewed in the most favorable aspect to her. In justification of the course she followed, it may be pointed out that she sounded her own horn as she approached the intersection, but heard no signal from the other car so as to warn her of its presence in the neighborhood. Knowing of the location of the 'stop' sign, in crossing the intersection she had the right to rely, as she said she did, upon the fact that any one approaching on Jefferson avenue would observe it; and even though, as she entered the intersection, she appreciated the fact that defendant had not stopped at the point called for by the sign, she nevertheless felt that because of it she had the right of

way over him, and that he would yet stop for her to pass ahead of him, as she thought he had ample time to do. Furthermore, with her car going at the greater speed of the two, it is doubtful if it was within her power to have avoided the collision, after the imminence of her peril became known to her. These facts, we think, would justify reasonable minds in reaching different conclusions about the effect to be ascribed to her conduct; and consequently, the demurrer to all the evidence was properly overruled. Calhoon v. D. C. & E. Mining Co., 202 Mo. App. 564, 209 S. W. 318; Ehman v. Himeles (Mo. App.) 243 S. W. 241; Westerman v. Brown Cab Co. (Mo. App.) 270 S. W. 142."

The defendant's counsel call particular attention to and place reliance upon Schloss v. Reymond, 11 La. App. 390, 122 So. 721. The facts in that case sufficiently distinguish it from the case at bar. We find fault neither with its reasoning nor the result. But the facts of Hinton v. Tri-State Transit Co. (La. App.) 151 So. 116, are more like those here disclosed and the decision there made accords with our present holding.

■ From what we have said it is apparent that we find without merit the first three points relied upon for reversal. The fourth and last point urged predicates error upon the claim that plaintiff was permitted by the trial court to change the theory of his case. The argument runs that by his complaint, the plaintiff stood upon the authority of the purported Ordinance 165 as giving him favored passage in the intersection at the time in question; that after closing his case and after the trial court had held the ordinance invalid, he shifted his position to a claim of right of way by virtue of the established and maintained stop signs on Alameda boulevard.

We are not persuaded by this argument. The material issue, for the bearing which it might properly have upon the question of negligence by either party, was whether plaintiff had the right of way. If when entering upon the trial he expected to prove such claim by virtue of the ordinance, but in the course of trial learned he must rely upon the notoriety and custom incident to the established and maintained stop signs, this involved, to be sure, a change in his proof, but not as we consider any change in theory. Furthermore, as pointed out by plaintiff's counsel, no objection was made at the trial that any change in theory was occurring.

It follows from the views expressed that the judgment must be affirmed, and it is so ordered.

WATSON, C. J., and HUDSPETH, BICKLEY, and ZINN, JJ., concur.